**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

ERIC GRIFFIN WALKER,

CASE NO. 2:18-cv-12928

   *Plaintiff*,      DISTRICT JUDGE STEPHEN J. MURPHY, III

*v.*           MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL
SECURITY,

   *Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (R. 15, 19)

### I.  RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports Defendant Commissioner of Social Security's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment, (R. 15), be **DENIED**, the Commissioner's Motion, (R. 19), be **GRANTED**, and the Commissioner's final decision denying benefits be **AFFIRMED**.

### II.  REPORT

#### A.  Introduction and Procedural History

This is an action for judicial review of a final decision by the Commissioner of Social Security denying Plaintiff Eric Griffin Walker's claims for Disability Insurance Benefits (DIB) under Title II, 42 U.S.C. § 401 *et seq.* and Supplemental Security Income (SSI) under Title XVI, 42 U.S.C. §§ 1381-1383f. (R. 1).

1

The case is presently before the Court upon the parties' cross-motions for summary judgment. (R. 15, 19) .

Plaintiff filed the present applications for DIB and SSI in August 2014, alleging that his disability began May 25, 2013. (R. 11 PageID.416-422). Plaintiff had previously filed similar concurrent claims, which were denied by administrative law judge (ALJ) Oksana Xenos on May 24, 2013. (*Id.* at PageID.164-181). ALJ Xenos found that Plaintiff's severe impairments limited him to a "range of light work" and that although Plaintiff could not perform any of his past work, he could nevertheless perform other work. (*Id.* at PageID.180).

His present claims, filed in 2014, were denied on January 26, 2015; thereafter, Plaintiff requested a hearing. (*Id.* at PageID.338). ALJ Carol Guyton conducted this hearing on April 5, 2016 and denied both Plaintiff's claims in her decision on May 3, 2016. (*Id.* at PageID.228-238). In ALJ Guyton's 2016 decision, she opined that Plaintiff has the following severe impairments: "a psychotic disorder, a general anxiety disorder, obesity, a history of deep vein thrombosis, and lumbago." (*Id.* at PageID.231). Like the previous ALJ, ALJ Guyton opined that these impairments limited Plaintiff to a "range of light work," which "precluded him from performing his past relevant work but left him capable of performing other work." (*Id.* at PageID.236).

Plaintiff filed an appeal with the Appeals Council, which vacated the ALJ's order and remanded to the ALJ, who was to "proffer all post hearing evidence" and "enter into the record a copy of the proffer letter, a copy of the new evidence, and any comments received from the claimant and representative regarding the new evidence." (*Id.* at

PageID.245). The ALJ was further directed to obtain additional evidence on Plaintiff's impairments to "complete the administrative record in accordance with regulatory standards regarding consultative examinations and existing medical evidence;" to give Plaintiff "the opportunity to review the post hearing evidence;" and "[g]ive further consideration to the claimant's maximum residual functional capacity [RFC] during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations." (*Id*. at PageID.246).

On remand, ALJ Guyton held a second hearing on September 28, 2017 and issued a decision again denying both Plaintiff's claims on January 2, 2018. (*Id*. at PageID.47-70). In this decision, ALJ Guyton determined that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of his severe impairments, which the ALJ found were: "status post deep vein thrombosis and pulmonary embolism, lumbago with sciatica, obesity, bipolar disorder, generalized anxiety disorder, schizoaffective disorder, schizotypal personality disorder." (*Id*. at PageID.51). ALJ Guyton again found that although Plaintiff was unable to perform his past relevant work, other jobs existed in the national economy that he could perform. (*Id*. at PageID.68). Thus, ALJ Guyton determined that Plaintiff had not been under a disability since the alleged onset date of May 25, 2013 and denied his claims accordingly. (*Id*. at PageID.69). Plaintiff again filed a request for review with the Appeals Council, which was denied on July 25, 2018. (R. 11 at PageID.244-48). This action followed. (R. 1).

### B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative

3

decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

## C.    Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

4

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is to

be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.
>
> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir.

2001).

"Through step four, the claimant bears the burden of proving the existence and

severity of limitations caused by [his or] her impairments and the fact that [he or] she is

precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*,

5

336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)). The RFC "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2).

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled from May 25, 2013 to the date of the decision. (R. 11 at PageID.49-70). At step one, the ALJ found that Plaintiff had met the insured status requirements of the Social Security Act through September 30, 2013, and that he had not engaged in substantial gainful activity since May 25, 2013. (R. 11 at PageID.51). At step two, the ALJ concluded that Plaintiff had the following severe impairments: obesity, bipolar disorder, status post deep vein thrombosis and pulmonary embolism, lumbago with sciatica, generalized anxiety disorder, psychotic disorder, schizoaffective disorder, and schizotypal personality disorder. (*Id.*). At step three, the ALJ decided these impairments did not meet or medically equal a listed impairment. (*Id.*).

Before proceeding to the final steps, the ALJ found that Plaintiff had the RFC to perform

6

light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that he cannot climb ladders or ropes or scaffolds, and can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, and can frequently handle/finger with the upper extremities; the claimant can perform unskilled work, that is limited to simple repetitive self-paced work, simple routine tasks, involving no more than simple short instructions and simple work related decisions; the claimant cannot work on a team, but can work where there would only be minimal changes in the work setting and a few work place changes, and can have only occasional contact with co-workers, supervisors, and no contact with the general public.

(*Id*. at PageID.53). At step four, the ALJ found Plaintiff unable to perform any past relevant work. (*Id*. at PageID.68). Finally, at step five, the ALJ determined that Plaintiff could perform a significant number of jobs in the national economy based on his age, education, work experience, and residual work capacity. (*Id*. at PageID.68).

### E.    Administrative Record

#### 1.    Medical Evidence

##### i.    2012 Medical Evidence

Plaintiff began going to Community Care Services for psychiatric evaluations in 2012. (*Id*. at PageID.709-964). At his first visit on October 3, 2012, Plaintiff exhibited symptoms of "mania, depression, feeling irritable, difficulty concentrating—thoughts can feel clouded. Sleep and eating patterns are irregular. Can feel hopeless and worthless. Symptoms of paranoia . . .experiences auditory and visual hallucinations." (*Id*. at PageID.960). He was diagnosed with Schizoaffective disorder and personality disorder NOS. (*Id*.). Physically, Plaintiff had "high blood pressure and cholesterol, acid reflux, shingles-Herpes Simplex, bowel impaction, arthritis, broken fingers and wrist." (*Id*.). He could "get extremely mad and black out." (*Id*. at PageID.945). On October 10, Plaintiff

met with Amy Karwowski for a group therapy session, where "[s]ome [p]rogress" was noted. (*Id*. at PageID.940-41).

On October 12, Plaintiff met with therapist Brad Karwowski for "treatment planning," and "[s]ome [p]rogress" was noted. (*Id*. at PageID.938-39). Plaintiff met with Karwowski again on October 29 for more treatment planning, and Karwowski noted that Plaintiff had symptoms of psychosis and "denie[d] any SI/HI such as auditory hallucination, paranoia, and delusions. In addition [Plaintiff] states he has depression, difficulty managing anxiety, trouble controlling anger, mood disturbances, and case management needs." (*Id*. at PageID.927).

On November 29, 2012, Plaintiff met with Dr. Timothy Chapman, where he complained of "anxiety and depression worse since death of father and grandmother in 2007" and "multiple physical health concerns" and that "his PCP will not prescribe him any meds until he is in treatment with a psychiatrist." (*Id*. at PageID.922). At this visit, Dr. Chapman noted Plaintiff appeared anxious in mood, "appropriate to mood," "full and reactive" in affect, and "fully oriented." (*Id*. at PageID.925). Dr. Chapman diagnosed Plaintiff with generalized anxiety disorder and schizotypal personality disorder. (*Id*.).

Plaintiff visited Brad Karwowski again on December 11, 2012 for an individual therapy session. (*Id*. at PageID.919-921). During this session, Plaintiff identified several triggers for his anxiety and panic attacks as well as coping mechanisms to manage them; "[s]ome [p]rogress" was noted. (*Id*. at PageID.919-920). On December 18, Plaintiff met with case manager Marway Johnson; at this appointment, he noted he wanted to become more organized and "a more consistent person." (*Id*. at PageID.916). Johnson marked that

"[p]rogress" was "made." (*Id.* at PageID.917.)

### ii.   2013 Medical Evidence

On January 15, 2013, Plaintiff met with Karwowski for psychotherapy to address treatment goals, which included alleviating depression, developing coping strategies, and identifying triggers. (*Id*. at PageID.913-15). "Some [p]rogress" was made. (*Id.* at PageID.914.) Then on January 24, Plaintiff met with Dr. Chapman, who took stock of Plaintiff's medications (Effexor, Benadryl, Celexa, Fenvir, Lisinopril, Neurontin, and Prilosec) and noted that Plaintiff's grooming and hygiene were normal, his attitude pleasant and cooperative, speech spontaneous with normal rate and tone, he had full affect with no perceptual disturbances, and appeared anxious (*Id*. at PageID.910-912). At this visit, Plaintiff told Dr. Chapman that he had run out of Effexor and had been having more anxiety and auditory hallucinations, that his primary care physician had stopped prescribing him Ativan, and that he had "stabbed himself in the head with scissors and has been banging his head against walls." (*Id*. at PageID.911). During this month, Plaintiff sought refills on prescriptions from Dr. Mohey, who noted Plaintiff had herpes simplex virus (HSV) outbreaks and prescribed him Effexor; Dr. Mohey also noted that Plaintiff's judgment and insight were "intact," that his mood was "normal," that his affect was appropriate," and that Plaintiff denied joint pain or limitation of motion. (*Id*. at PageID.693-697).

On January 29, Plaintiff met again with Brad Karwowski for psychotherapy, and "[s]ome [p]rogress" was noted. (*Id*. at PageID.907-909). The objectives were for Plaintiff to "identify 2-3 triggers which contribute to or precipitated an acute psychotic episode and

discuss in session" within three months of the treatment plan, identify coping mechanisms, and help Plaintiff become more responsible. (*Id.* at PageID.907-908).

On February 5, 2013, Plaintiff went to Henry Ford Wyandotte Hospital with complaints of injury in his right hand and back pain after a fist fight. (*Id.* at PageID.539-543). At that time, Plaintiff had been taking omeprazole, Ativan tab, Celexa, and Effexor. (*Id.* at PageID.539). At intake, it was determined that his medical history included "history of gastrointestinal disease, including gastroesophageal reflux disease, viral meningitis. Genital herpes. History of hyperlipidemia." (*Id.* at PageID.540). On review of symptoms, Plaintiff reported "back pain, injury, myalgias" in his right and lower back but that overwise "all relevant systems reviewed and found negative other than described." (*Id.*). The physician noted that Plaintiff presented with back pain "without evidence of cauda equina, spinal epidural abscess, AAA, or other life-threatening illnesses." (*Id.* at PageID.541). The physical examination indicated that Plaintiff's back presented "normal" range of motion, "tenderness" in "paraspinal to the right lower," and "no costovertebral angle tenderness." (*Id.* at PageID.540). Psychiatrically, the physician noted findings of Plaintiff "oriented to person place and time, normal affect, judgment normal." (*Id.* at 541).

On February 11, Plaintiff met with Brad Karwowski for psychotherapy in which the pair tried to reach the same objectives as previously stated; Karwowski noted Plaintiff made "[s]ome [p]rogress." (*Id.* at PageID.905-906). On February 21, Plaintiff had a follow-up session to address those objectives; he again made "some progress." (*Id.* at PageID.902-904). Plaintiff also visited Dr. Chapman on February 21; his grooming and hygiene were appropriate, attitude "pleasant and cooperative," speech fluent, his thought content

10

contained no "suicidal or homicidal ideation," his thought processes was "goal directed," and there were "no perceptual disturbances . . . evident." (*Id*. at PageID.899-901). During this visit, Plaintiff stated he had an "explosion of anger at stepfather," with whom he lived, and that he felt "agitative and restless," hyperactive, and unable to perform his music. (*Id*. at PageID.900).

On March 4, 2013, Plaintiff met with Karwowski for psychotherapy, during which Karwowski noted Plaintiff had made "[s]ome [p]rogress." (*Id*. at PageID.896-98). They met again on March 14 for psychotherapy, in which Karwowski again noted Plaintiff had made "[s]ome [p]rogress." (*Id*. at PageID.893-95). In his visit to Dr. Chapman on March 21, Plaintiff was prescribed Risperdal; Dr. Chapman noted that Plaintiff's grooming and hygiene were "appropriate," that his attitude was "pleasant and cooperative," that he made good eye contact, that his mood was "ok," and his affect was "full range and appropriate," and that his judgment and insight were "intact." (*Id*. at PageID.890-892). During this appointment, Plaintiff stated he had thoughts of hurting someone who stole his guitar but "no intention of doing anything" and that his sleep and anxiety problems had returned. (*Id*. at PageID.891). He continued playing in a band and denied recent use of alcohol or drugs. (*Id*.). On March 27, Plaintiff met again with Karwowski for psychotherapy, and Karwowski noted Plaintiff had made "[s]ome [p]rogress." (*Id*. at PageID.887-889).

On April 11, Plaintiff met with Dr. Chapman again, and Plaintiff stated that he was "constantly worried about his thoughts and dreams," that he felt more paranoid but continued playing in his band. (*Id*. at PageID.884-886).

Plaintiff also has an appointment with Brad Karwowski on April 11 for

psychotherapy, at which Karwowski noted Plaintiff had made "[s]ome [p]rogress." (*Id*. at PageID.881-883). He had follow-ups with Karwowski on April 16 and April 22 to continue working towards the objectives and making "[s]ome [p]rogress. (*Id*. at PageID.875-880). On May 1, Karwowski noted that Plaintiff had made "[s]ome [p]rogress" and that he would be referred to supportive employment and given referrals for food and clothing, as Plaintiff told Karwowski he had "no money." (*Id*. at PageID.872-874).

On May 6, Plaintiff saw Dr. Chapman again and complained of auditory and visual hallucinations, noted that he "had more fear of the symptoms now than before," but that therapy was going well; Dr. Chapman noted that Plaintiff exhibited "[g]ood grooming and hygiene," that his mood was "ok," that there were "no perceptual disturbances evident," that Plaintiff's thought content contained "no suicidal or homicidal thoughts," and that his insight and judgment were "intact." (*Id*. at PageID.870). On May 9, Plaintiff visited Dr. Mohey for medication refill and reported having an HSV breakout; he also requested medication for pain and anxiety. (*Id*. at PageID.690). In the review of systems, Plaintiff denied, among other things, limitation of motion, anxiety, depression, hallucinations, and altered mental status. (*Id*.).

On June 3, Plaintiff saw Dr. Chapman and expressed frustration over the denial of his disability appeal and stated that he had been hearing more voices and having visual hallucinations, that his sleep was poor, and that he continued to ride his bike in the neighborhood; objectively, his grooming and hygiene were good, attitude pleasant and cooperative, speech normal, mood "ok," he had no evident perceptual disturbances, and his insight and judgment were intact." (*Id*. at PageID.866-868). On June 5, Plaintiff went to

12

Henry Ford Wyandotte Hospital with a skin complaint of a rash on his groin. (*Id.* at PageID.548). Neurologically, Plaintiff was "oriented to person, place, and time," and his speech and gait were normal. (*Id.*). The review of symptoms noted "skin changes," but was negative for constitutional, cardiovascular, respiratory, GI, and psychiatric symptoms. (*Id.* at PageID.549). The physical examination indicated that his back exam was "normal," his affect was "normal," and his concentration was "normal." (*Id.*). On June 6, Plaintiff met with Brad Karwowski for psychotherapy to address "current depressive symptoms," as Plaintiff reported feeling hopeless and helpless and a result of the denial of his disability appeal. (*Id.* at PageID.863-865). Plaintiff complained of nightmares during this visit. (*Id.* at PageID.863). Karwowski and Plaintiff met again on June 25 to address symptoms of anxiety and vivid nightmares, which Plaintiff suspected had been exacerbated by lack of medication at the time; Plaintiff had made "[s]ome [p]rogress." (*Id.* at PageID.860-862).

On June 26, Plaintiff met with Dr. Chapman and stated that he mistakenly doubled his Risperdal and Haldol and that it "seemed to reduce the anxiety significantly." (*Id.* at PageID.857-859). His mood was better, he had been seeing a therapist twice a month, and he had been playing music with his son. (*Id.* at PageID.858).

On July 3, Plaintiff went in for an STD check, and the nursing assessment indicated he was "alert, cooperative," and that his speech was coherent. (*Id.* at PageID.546). On July 9, Plaintiff had another psychotherapy session with Karwowski in which Plaintiff expressed "agitation and irritability regarding his medical issues and lack of health insurance;" Plaintiff had made "[s]ome [p]rogress." (*Id.* at PageID.854-856). On July 5, Plaintiff saw Dr. Mohey for refills and complained of a groin yeast infection; in the review

13

of systems, Plaintiff denied anxiety, depression, and hallucinations. (*Id.* at PageID.687). On July 23, Plaintiff met again with Karwowski for psychotherapy and discussed the same issues as they had in the previous appointment; Karwowski again noted that Plaintiff had made "[s]ome [p]rogress." (*Id.* at PageID.851-853). The next day, on July 24, Plaintiff met with Dr. Chapman, who increased the Haldol dosage to 10mg and noted Plaintiff's anxiety about an upcoming concert he was going to perform with his band. (*Id.* at PageID.848-850).

On August 5, Plaintiff visited Dr. Mohey for, among other things, generalized anxiety; in the physical examination, Plaintiff's breathing was normal, he had no chest pain, and he indicated "[t]enderness to palpation of bilateral hands, lumbar paraspinal muscles, bilateral knee." (*Id.* at PageID.684-685). On August 21, Plaintiff visited Dr. Chapman; he stated his mood was better, his anxiety and paranoia were "almost gone," and he continued playing with his band, but that his insomnia had worsened—for which Dr. Chapman prescribed trazadone. (*Id.* at PageID.845-847). The same day, Plaintiff had psychotherapy with Brad Karwowski and they discussed cognitive restructuring and a 4-4-6 breathing technique to assist Plaintiff in anxiety management; Plaintiff made "[s]ome [p]rogress." (*Id.* at PageID.842-844).

On September 19, Plaintiff met with Dr. Chapman; at this appointment, Plaintiff stated he had doubled his trazodone and that it made his insomnia worse. (*Id.* at PageID.840). Dr. Chapman noted that Plaintiff was still playing in his band and that he appeared lethargic. (*Id.*). On September 30, Plaintiff met with Patricia Justice, who wrote that he seemed "[a] little confused and trouble with comprehension" and had made "[n]o

14

[p]rogress." (*Id.* at PageID.836-837).

On October 7, Plaintiff met with Brad Karwowski for psychotherapy to address stressors; Karwowski noted that Plaintiff had made "[s]ome [p]rogress." (*Id.* at PageID.833-835). On October 17, Plaintiff met with Dr. Chapman for a psychiatric evaluation in which Plaintiff said he was doing better since adding antipsychotics to his regimen, that Seroquel was not helping his insomnia as much as it had before, that his depression had worsened, that he had "multiple psychical health concerns," that he played in multiple bands, and that he was "much more goal directed than during initial eval a year ago." (*Id.* at PageID.828-832).

On October 24, Plaintiff saw Brad Karwowski for an assessment (*Id.* at PageID.808-831). During this assessment, Plaintiff stated he experienced hallucinations, paranoia, nightmares, delusions, depression, anxiety, mood disturbances, and case management needs; most of his choices were made independently but his goal for the future was to gain more independence. (*Id.* at PageID.809). In terms of needs, Plaintiff stated he needed income, transportation, and mental health assistance. (*Id.*). Regarding his mental status, Plaintiff was oriented to individual, place, time, and situation; his awareness was "alert;" his memory was "intact;" his judgment was "good;" the content of his thought was "unremarkable;" his concentration was "normal;" he had auditory hallucinations; his stream of mental activity was "normal;" his presentation was "unremarkable;" and his emotional state was "depressed." (*Id.* at PageID.811-812). His risk assessment indicated that he did not pose a danger to himself or others. (*Id.* at PageID.812). His assessed risk was "low." (*Id.* at PageID.815). He could independently eat, dress, toilet, bathe, groom,

15

and take medicine. (*Id*. at PageID.816-817). He had economic problems, problems accessing healthcare, housing problems, occupational problems, and problems with his primary support group. (*Id*. at PageID.830). On October 31, Plaintiff saw Dr. Mohey for a genital herpes outbreak and reported "no other concerns" besides anxiety. (*Id*. at PageID.682).

On November 14, Plaintiff visited Dr. Chapman again, who noted that Plaintiff was sleeping 8-9 hours, that his mood was better, that he was still playing with his band, and that he had no hallucinations at the time. (*Id*. at PageID.805-807). On December 12, Plaintiff met with Dr. Mohey; Plaintiff stated he was doing well with his meds, that he was "stressed out" because his ex-girlfriend was injured, and that he needed more Ativan. (*Id*. at PageID.802-804). On December 19, Plaintiff met with Brad Karwowski for treatment planning (*Id*. at PageID.794-803).

On December 31, Plaintiff received medical care for complaints of dull and aching left calf pain, which was determined to be moderate in severity; his mental state was "normal." (*Id*. at PageID.552-57). Relevant here, the diagnoses included pulmonary embolism (PE), acute deep vein thrombosis (DVT), hypertension, and bipolar disorder. (*Id.* at PageID.558). The following day, Plaintiff attended a follow-up consultation; a CAT scan was performed and Plaintiff was "noted to have bilateral pulmonary embolisms." (*Id*. at PageID.560).

### iii.    2014 Medical Evidence

On January 9, 2014, Plaintiff saw Dr. Chapman, who noted Plaintiff's recent hospitalization for PE and DVT, that Plaintiff was depressed about his new medical issues,

16

that he was "otherwise stable with psychiatric symptoms," and that he had resumed playing concerts with his band. (*Id*. at PageID.791-793). He saw Dr. Mohey that day for a hospital follow-up, at which Plaintiff reported having "some left leg pain." (*Id*. at PageID.679). Plaintiff met with Brad Karwowski for treatment planning on January 14. (*Id*. at PageID.785-790).

On February 6, Plaintiff again met with Dr. Chapman, who noted Plaintiff was "doing fine with medications" and that the hallucinations had decreased. (*Id*. at PageID.782-784). On February 11, Plaintiff met with Karwowski for targeted case management; Plaintiff indicated he needed assistance with navigation through the DHS system. (*Id*. at PageID.779-781). On February 21, Plaintiff visited Dr. Brandon Genson with complaints of leg pain as a result of thrombus in the left lower extremity; examination notes indicated that most of his systems were "normal," but that his left leg had a "tender superficial firm thrombus." (*Id*. at PageID.677-678). Plaintiff and Karwowski met again on February 26 for continued targeted case management to help Plaintiff navigate the DHS system. (*Id*. at PageID.776-778).

On March 6, Plaintiff met with Dr. Chapman; Plaintiff was "doing fine" but noticed it was difficult to sleep. (Id. at PageID.773-775). He met with Karwowski on March 18 for continued targeted case management and addressed Plaintiff's Medicaid eligibility and his upcoming SSI hearing. (*Id*. at PageID.770-772).

On April 3, Plaintiff saw Dr. Chapman and indicated that he was sleeping 8 hours, performing with his band, and that he was "looking forward to riding his bike again when the weather improves." (*Id*. at PageID.767-769). The same day, Plaintiff met with

17

Karwowski for continued targeted case management, during which the two discussed Plaintiff's need for medication he could not afford and financial solutions for obtaining discounted prescriptions. (*Id*. at PageID.764-766). He met with Patricia Justice on April 25 for peer specialist services, who noted that Plaintiff "continues to make progress." (*Id*. at PageID.762-763). He met with Karwowski on April 28 for continued targeted case management. (*Id*. at PageID.759-761).

On May 1, Plaintiff met with Dr. Chapman and indicated that he was "doing well with current meds," that his "sleep improved changing the dose time of Seroquel to 6pm," and that he was playing in "three different bands and believes he will start traveling soon." (*Id*. at PageID.756-758). On May 9, Plaintiff saw Dr. Genson for refills and noted he had "continued pain in his leg which he thinks is from the blood clot." (*Id*. at PageID.675). On May 26, Plaintiff received treatment for torso, hand, and leg injuries sustained after falling off his bike; upon psychiatric evaluation, his behavior, mood, speech, and affect were determined to be "normal." (*Id*. at PageID.573-605). A CT scan was performed and found to be "unremarkable." (*Id*. at PageID.580). Plaintiff met with Dr. Chapman again on May 29; he "broke a rib and busted his hand falling off his bike," but stated he was otherwise "doing great" and that his sleep and music were good. (*Id*. at PageID.753-755). Dr. Chapman noted that Plaintiff's grooming and hygiene were "appropriate," that his attitude was "pleasant and cooperative," that his psychomotor activity was normal, that his mood was "good," and that his insight and judgment were "intact." (*Id*. at PageID.754).

On June 6, Plaintiff visited Dr. Genson as a follow-up visit for rib pain he incurred after falling off his bike; Plaintiff complained of pain and discomfort but the abrasions on

18

his hand and knee were improving. (*Id.* at PageID.671). On June 18, Plaintiff met with Patricia Justice for peer specialist services, who noted that Plaintiff had made "[s]ome [p]rogress." (*Id.* at PageID.751-752). On June 20, he saw Dr. Genson again seeking refills for Norco to treat his rib pain due to breaking a rib after falling off his bike a few weeks prior; the review of systems indicated that all other systems were "negative." (*Id.* at PageID.669). On June 25, Plaintiff saw Dr. Genson for a checkup with complaints of cough with yellow sputum and upper respiratory symptoms including "sore throat, fatigue, cough with sputum production." (*Id.* at PageID.652). On June 26, Plaintiff met with Dr. Chapman and indicated that he continued to do well with his medications, practice with his band, sleep normally, and that his therapist was on vacation, which was stressful for him. (*Id.* at PageID.748-750).

On July 3, Plaintiff saw Dr. Mohey for medication refills; Dr. Mohey noted that he had "no new concerns" and that Plaintiff's skin wounds from falling off his bike were healing. (*Id.* at PageID.667). Plaintiff saw Dr. Genson on July 16 for Valtrex refills and to review labs. (*Id.* at PageID.665). On July 28, Plaintiff saw Dr. Chapman again and indicated that the Haldol "made a big difference in controlling the hallucinations," that his sleep continued to be "good," and that he continued playing in multiple bands. (*Id.* at PageID.745-747).

Plaintiff had a follow-up visit with Dr. Genson on August 1 in which he indicated he had "no new concerns" but had some discomfort around his rib fracture. (*Id.* at PageID.663). On August 7, Plaintiff had an assessment with Karwowski, which indicated that Plaintiff attended all of his daily responsibilities, continued in his bands, could

19

independently go to the dentist, restaurants, movies, bank, grocery store, mall, and post office, and that he posed minimal risk to himself and others. (*Id*. at PageID.723-744). He saw Dr. Mohey on August 18 for refills and noted that he was in a "good mood," was seeing a counselor bi-weekly, and that he was trying to change his diet to lose weight. (*Id*. at PageID.661). On August 19, Plaintiff met with Karwowski again for psychotherapy to address "health symptoms and life circumstances"; Plaintiff reported experiencing depressive symptoms at the time but had made "[s]ome [p]rogress." (*Id*. at PageID.720-722). On August 21, Plaintiff met with Dr. Chapman and indicated he was "doing fine with current medications" and that he was "concerned about his PCP continuing Ativan"; his mood was "good," his grooming and hygiene were "appropriate," and no "perceptual disturbances" were evident. (*Id*. at PageID.717-719). On August 26, he saw Dr. Mohey for ankle pain, which he had endured for three days; Dr. Mohey noted Plaintiff's "mild tenderness to left medial superior aspect of malleolus, no calf swelling, no erythema or warmth of calf pain." (*Id*. at PageID.659-660). On August 29, Plaintiff had a follow-up visit with Dr. Mohey in which he complained of pain of his right lateral ankle and worried he may have DVT; all other systems were "negative." (*Id*. at PageID.657).

He saw Dr. Mohey again on September 2 for refills on Ativan and noted DTV; all other systems were "negative." (*Id*. at PageID.655-656). On September 17, Plaintiff met with Karwowski and indicated he was having difficulty obtaining medication; Plaintiff had made "[s]ome [p]rogress." (*Id*. at PageID.714-716). On September 18, Plaintiff completed a psychiatric evaluation with Dr. Chapman in which he indicated frustration over not having access to Ativan, that he was having sporadic visual and audio hallucinations that

20

were alleviated by medication, and that he continued playing in his band; his presentation, character of speech, content of thought, and thought processes were "unremarkable," and his stream of mental activity was "normal." (*Id*. at PageID.709-713).

On October 6, Plaintiff had a psychotherapy session with Karwowski in which they addressed Plaintiff's mental health and life stressors; Plaintiff explained he was "overwhelmed with worry and consumed with anxiety regarding the appeals hearing for his SSDI case next month." (*Id*. at PageID.1038-1040). On October 16, Plaintiff met with Dr. Chapman, who noted that Plaintiff continued having anxiety issues and was not sleeping; Plaintiff was still living with his mother and playing in several bands. (*Id*. at PageID.1035-1037). On October 20, Plaintiff saw Karwowski for a psychotherapy session in which they addressed stressors; Plaintiff noted mood stability and reported two weeks of being conflict free internally and externally. (*Id*. at PageID.1032-1034). On October 28, Plaintiff saw Dr. Mohey with complaints of facial pain, right eye and sinus pressure, and had a cold for five days; his other physical assessments were all "normal." (*Id*. at PageID.1453-1454).

Plaintiff saw Dr. Chapman again on November 13 and noted he still had mild visual hallucinations and expressed that the "current meds are helping a lot," and he was taking a higher dose of Ativan than before; Plaintiff noted feeling "a lot of anxiety" but his mood was "good." (*Id*. at PageID.1029-1031). Plaintiff met with Karwowski again on November 17 for psychotherapy and Karwowski wrote a narrative for Plaintiff at his lawyer's request; Karwowski noted "[p]rogress [m]ade," which appears to be a greater level of progress than "some progress." (*Id*. at PageID.1026-1028).

21

Plaintiff visited Dr. Mohey on December 4 with complaints of abdominal pain; he had been vomiting and had gained 20 pounds since the previous visit. (*Id*. at PageID.1451). He visited Dr. Mohey again on December 6 with a herpes outbreak and noted he usually has two painful outbreaks a year. (*Id*. at PageID.1449).

In a consultative examination on December 10, Dr. Nims noted that Plaintiff complained of "zosters, shingles, vertigo, back problem, hypertensive cardiovascular disease and hypertension. (*Id*. at PageID.966). Plaintiff stated his primary problems were mental and his lower back; specifically, Plaintiff said he had a 9-year history of non-radiating lower back pain that he graded as a 9/10, but never received treatment for his back pain and denied ever having an MRI performed on his back. (*Id*.). Plaintiff stated he could walk half a block before stopping and denied any problems sitting or standing but could no longer participate in "continuous bending." (*Id*.). Dr. Nims determined that Plaintiff seemed "capable of most non-strenuous tasks without excessive walking"; the review of systems indicated that Plaintiff had "non-radiating back pain," but denied chest pain, respiratory problems, and other systematic problems. (*Id*. at PageID.966-970).

Plaintiff saw Dr. Chapman on December 11, who noted Plaintiff was "doing well on his current meds," that Plaintiff had spoken to his therapist about the possibility of having ADHD, and that Plaintiff continued to perform with his band. (*Id*. at PageID.1023-1025).  Plaintiff saw Karwowski on December 15 for treatment planning, during which time they discussed Plaintiff's progress and objectives moving forward with treatment. (*Id*. at PageID.1011-1022).

### iv.    2015 Medical Records

On January 7, 2015, Plaintiff met with Karwowski for psychotherapy, and Karwowski noted that Plaintiff fit the criteria for ADHD; Plaintiff had made "[s]ome [p]rogress." (*Id*. at PageID.1008-1010). Plaintiff went to an appointment with Dr. Chapman on January 8 and asked Dr. Chapman for an Adderall prescription, to which Dr. Chapman responded that he was not convinced of Plaintiff's ADHD; Plaintiff noted he was traveling to Ohio with his band for a concert the coming weekend. (*Id*. at PageID.1004-1007). On January 13, Plaintiff visited Dr. Mohey with complaints of a herpes outbreak and left finger numbness; he was still able to play guitar but in repetitive movements and he complained of "some neck stiffness as well." (*Id*. at PageID.1447). Plaintiff visited Karwowski for targeted case management on January 21 and primarily requested Karwowski's assistance in understanding SSA paperwork. (*Id*. at PageID.1001-1003).

On February 5, Plaintiff had an appointment with Dr. Chapman and reported "doing about the same with current medications," that he had an upcoming record he was releasing with his band, that he had been attending church, and that he was still having some hallucinations. (*Id*. at PageID.997-1000). Plaintiff also saw Karwowski for psychotherapy on February 5, and noted he felt he was not being treated successfully at CCS because Dr. Chapman refused to prescribe him Adderall; Karwowski noted that Plaintiff met "criteria based on DSM-IV." (*Id*. at PageID.994-996). On February 6, Plaintiff visited Dr. Mohey with complaints of losing consciousness; Mohey noted this happened once a week and that the episodes lasted less than a minute. (*Id*. at PageID.1445). At his February 18 appointment with Karwowski, Plaintiff noted he felt his medication was effective and felt optimistic that he would be awarded disability. (*Id*. at PageID.991-993).

23

Plaintiff saw Karwowski again on March 4 and noted that he had no form of income or assets, that Plaintiff was going on a date in the coming week, and that the medication was effective. (*Id*. at PageID.988-990). On March 5, Plaintiff met with Dr. Chapman; he noted having some hallucinations, denied having side effects from his medications, and told Dr. Chapman that he still went to church and thought about joining the church band. (*Id*. at PageID.984-987). On March 7, Plaintiff visited Dr. Mohey for a follow-up for URI. (*Id*. at PageID.1443). On March 18, Plaintiff met with Karwowski for psychotherapy and noted that he had felt a slight increase in his mood stability but still experienced symptoms he was unable to control. (*Id*. at PageID.981-983).

On April 2, Plaintiff saw Karwowski again for psychotherapy and reported experiencing symptoms that he tried to manage; Plaintiff noted that he utilized positive self-talk, recognition of cognitive distortions, and breathing techniques. (*Id*. at PageID.1283-1285). Plaintiff visited Dr. Mohey complaining of shortness of breath and chest discomfort on April 10. (*Id*. at PageID.1441). Plaintiff and Karwowski met again for psychotherapy on April 15, during which they addressed Plaintiff's symptoms of depression, which Plaintiff attributed to lack of income. (*Id*. at PageID.1280-1282). On April 16, Plaintiff followed up with Dr. Mohey and noted he had been taking his albuterol inhaler bis in die (BID) and that shortness of breath had "completely resolved." (*Id*. at PageID1439). On April 22, Plaintiff saw Dr. Chapman, who noted Plaintiff continued to play in his band, had an episode of "severe pain and falling asleep on the stage the past weekend," and that Plaintiff stated his current medications were working. (*Id*. at PageID.1277-1279).

On May 4, Plaintiff met with Karwowski for targeted case management to address his need for assistance with DHS. (*Id*. at PageID.1274-1276). On May 18, they met again for psychotherapy, and Plaintiff noted he had resolved the DHS issue, that his mood and home environment were stable, and that he continued to utilize coping mechanisms. (*Id*. at PageID.1271-1273). On May 21, Plaintiff paid a visit to Dr. Chapman, where he explained he had a difficult time coping with his friend's recent suicide, but otherwise, his sleep was normal, his medications helped, and he continued playing in his band. (*Id*. at PageID.1268-1270). On May 26, Plaintiff saw Dr. Mohey for a herpes outbreak and was under stress from his friend's recent suicide. (*Id*. at PageID.1437).

On June 1, Plaintiff attended psychotherapy with Karwowski to address symptoms of depression and stress about his son. (*Id*. at PageID.1265-1267). On June 17, the pair met for psychotherapy again to address anxiety, depression, and additional life stressors. (*Id*. at PageID.1262-1264). On June 18, Dr. Chapman issued a psychiatric progress note indicating that Plaintiff was "doing about the same," continued playing with his band, continued having issues with his back, felt the medications were helping him, and slept about seven hours a night. (*Id*. at PageID.1258-1261). On June 19, Plaintiff visited Dr. Mohey with a complaint of back pain; he described it as "low back pain with shooting pain down right leg," and noted that Norco helped. (*Id*. at PageID.1435). On June 29, he visited Dr. Mohey complaining of being "sick"; he had severe sore throat. (*Id*. at PageID.1433).

On July 7, Plaintiff followed up with Dr. Mohey about his back pain, which he still had, but the medications and exercises were helping. (*Id*. at PageID.1431). On July 16, Dr. Chapman issued a progress note indicating Plaintiff continued to do well with the current

25

medication, that his sleep was good, that he continued playing in several bands, and that he was "in physical therapy three times a week for his back now." (*Id*. at PageID.1253-1257). On July 20, Plaintiff met with Karwowski for psychotherapy; Plaintiff noted feeling stable in his mood, remained in full compliance with his medications, had been playing in several bands, and did not get along with his stepfather. (*Id*. at PageID.1250-1252). On July 27, Plaintiff saw Dr. Mohey for back pain medication refills. (*Id*. at PageID.1428).

On August 5, Plaintiff saw Dr. Mohey with chest pain; his left interior chest pain was going into his back and left side of his jaw. (*Id*. at PageID.1425). At their August 13 psychotherapy appointment, Karwowski noted Plaintiff had been admitted to Wyandotte Hospital for symptoms of cardiac arrest; it was an anxiety attack. (*Id*. at PageID.1247-1249). The same day, Dr. Chapman issued a psychiatric progress note indicating that Plaintiff had a recent panic attack; his primary care physician recommended he switch from Ativan to Klonopin; he continued attending physical therapy and planned to tour with his band in Europe in November. (*Id*. at PageID.1243-1246). On August 27, Plaintiff met with Karwowski for psychotherapy; his mood was stable, he was losing weight and feeling better about himself, and continued to struggle with his live-in stepfather. (*Id*. at PageID.1240-1242).

On September 10, Plaintiff met with Dr. Chapman and noted that the medication was helping, the Klonopin "made a big difference," that he was no longer having chest pain from anxiety and continued playing in a band. (*Id*. at PageID.1234-1239). The same day, Plaintiff met with Karwowski for psychotherapy; Plaintiff's mood was stable, he kept active, he played in two bands, and he remained worried about his son. (*Id*. at PageID.1231-

26

1233). On September 15, Plaintiff saw Dr. Mohey with a complaint of an ingrown toenail. (*Id.* at PageID.1423). He presented on September 21 with groin pain and noted seeing a psychical therapist for his back pain. (Id. at PageID.1421). On September 24, he had another psychotherapy session with Karwowski; Plaintiff's mood was stable and he continued to play in bands. (*Id.* at PageID.1228-1230).

On October 8, Dr. Chapman issued a psychiatric progress note indicating that Plaintiff initially felt more depressed but that he was doing better with meds, that he continued playing in a band, and that his sleep and appetite were stable. (*Id.* at PageID.1223-1227). In his integrated biopsychological assessment on October 14, Karwowski noted that it was his clinical impression that Plaintiff "benefitted greatly from both psychiatric medication reviews and individual therapy session." (*Id.* at PageID.1205-1222). On October 12, Plaintiff saw Dr. Elnagger with complaint of a herpes outbreak. (Id. at PageID.1418). In their psychotherapy session on October 14, Karwowski addressed Plaintiff's symptoms of depression and strained relationship with his stepfather. (*Id.* at PageID.1202-1204). In their October 28 psychotherapy session, Karwowski noted that Plaintiff continued to work out, was "feeling better" from physical therapy, kept playing in his band, and kept avoiding his stepfather. (*Id.* at PageID.1199-1201).

On November 5, Dr. Chapman noted Plaintiff stated he felt like a financial burden to his mother and that he continued to play in his bands and planned to go to Europe; the anxiety medication helped "significantly" and he no longer had episodes of chest pain. (*Id.* at PageID.1195-1198). On November 6, Plaintiff reported to Dr. Mohey that he was sick and had a cough. (*Id.* at PageID.1416). In their November 11 psychotherapy session,

27

Karwowski noted Plaintiff was stable and that he recently played at a show in Cleveland with his band. (*Id*. at PageID.1332-1334). On November 23, Plaintiff saw Dr. Elnaggar for a follow up regarding his herpes outbreak. (*Id*. at PageID.1412). In their November 25 psychotherapy session, Karwowski noted Plaintiff was stable and that he continued to exercise. (*Id*. at PageID.1329).

On December 3, Dr. Chapman saw Plaintiff and noted he continued to do well with medications and that his chest pain decreased since starting Klonopin. (*Id*. at PageID.1324-1328). On December 8, Plaintiff saw Dr. Mohey with nose pain after being in a fight the weekend prior. (*Id*. at PageID.410). At their December 9 psychotherapy appointment, Karwowski addressed Plaintiff's anxiety and a recent physical altercation in which Plaintiff broke his nose; the pair discussed ways to deescalate situations and Plaintiff's European band tour in February. (*Id*. at PageID.1321-1322). On December 21, Plaintiff saw Dr. Elnaggar with complaints of back pain. (*Id*. at PageID.1407). On December 22, Plaintiff attended a Community Care Services treatment plan meeting to discuss goals of therapy. (*Id*. at PageID.1306-1320). On December 30, Plaintiff met with Dr. Chapman; Plaintiff posited he was doing well and that he still planned on a European tour with his band. (*Id*. at PageID.1302-1305).

### v.   2016 Medical Records

On January 4, Plaintiff attended physical therapy for lumbago with sciatica, generalized muscle weakness, and difficulty standing for prolonged periods. (*Id*. at PageID.1469-1471). On January 22, Plaintiff saw Dr. Elnaggar for a follow up and complained of back pain. (*Id*. at PageID.1404). At their psychotherapy visit on January 28,

2016, Plaintiff and Karwowski discussed Plaintiff's recent arrest for loitering for having been in a car with a friend who had medical marijuana. (*Id.* at PageID.1299-1301). On January 28, Plaintiff met with Dr. Chapman; they discussed the arrest, his upcoming plans to travel to Europe, and Plaintiff stated that he had episodes of sleepwalking. (*Id.* at PageID.1294-1298). On January 29, Plaintiff saw Dr. Mohey with complaints of facial redness with a "burning" pain. (*Id.* at PageID.1402).

On February 10, Plaintiff had a psychotherapy appointment with Karwowski, at which they discussed his sentencing, anxiety, upcoming trip to Europe, and Karwowski wrote the judge a letter to advocate for Plaintiff to have lenient sentencing. (*Id.* at PageID.1291-1293). On February 12, Plaintiff saw Dr. Elnaggar with complaints of ankle pain from twisting his ankle. (*Id.* at PageID.1399). At their psychopathy appointment on February 23, Karwowski and Plaintiff discussed anxiety, which Plaintiff felt regarding his upcoming trip to Europe with his band, as well as coping mechanisms. (*Id.* at PageID.1288-1290).

On March 15, Plaintiff followed up with Dr. Elnaggar and complained of back pain. (*Id.* at PageID.1785). During their March 17 psychotherapy appointment, Karwowski and Plaintiff discussed Plaintiff's recent trip to Europe, where he was unable to take his medications for almost two weeks, which made Plaintiff realize how effective the medications were in preventing his hallucinations and delusions; he resumed taking them and his condition markedly improved. (*Id.* at PageID.1659-1661). On March 24, Plaintiff visited Dr. Chapman; during this visit, Plaintiff noted he was back from his tour of Europe, that he drank on tour and played multiple shows in Spain, France, and Germany. (*Id.* at

PageID.1654-1658). The same day, Plaintiff visited Dr. Elnaggar with complaints of a sore throat. (*Id*. at PageID.1781). In his March 29 psychotherapy appointment with Karwowski, Plaintiff discussed his depression and difficulty adjusting since returning from Europe and that he felt irritable, anxiety-ridden, and depressed despite continued use of his medications. (*Id*. at PageID.1651-1653).

On April 4, Plaintiff followed up with Dr. Elnaggar and complained of pain and swelling in both legs; compression stockings helped. (*Id*. at PageID.1778). On April 11, Plaintiff and Karwowski had another psychotherapy appointment and discussed his Social Security hearing, his life stressors, and still getting situated after returning from Europe; Plaintiff had made progress and his medication had been effective. (*Id*. at PageID.1648-1650). On April 12, Plaintiff followed up with Dr. Elnaggar. (*Id*. at PageID.1774). On April 18, Plaintiff met with Karwowski for targeted case management. (*Id*. at PageID.1645-1647). On April 21, Plaintiff visited Dr. Chapman, who noted that Plaintiff continued playing in two bands and performed at shows regularly, that his mood was stable, that Plaintiff had difficulty sleeping, and denied any problems with recent hallucinations. (*Id*. at PageID.1641-1644).

On May 2, Plaintiff met with Karwowski for psychotherapy to address anxiety and noted that his medication regimen was working well for him. (*Id*. at PageID.1638-1640). On May 9, Plaintiff followed with Dr. Elnaggar and complained of back pain. (*Id*. at PageID.1771). At their psychotherapy session on May 16, they addressed Plaintiff's anxiety, inability to sleep, depression over denial of his benefits, and Plaintiff's desire to change his medications. (*Id*. at PageID.1635-1637). During his May 19 appointment with

Dr. Chapman Plaintiff noted his son was concerned about Plaintiff's slurred speech and wondered if Klonopin was the cause; his sleep was stable, and he rejoined his old band. (*Id*. at PageID.1630-1634). On May 27, Plaintiff followed up with Elnaggar and noted wanting to switch from Klonopin to Xanax. (*Id*. at PageID.1768).

On June 1, Plaintiff had a psychotherapy session with Karwowski in which Plaintiff reported he was "keeping himself busy," had recently played shows with his band, and had completed all the necessary protocols for his probation for a loitering offense; he continued to experience depression, mood swings, and anxiety. (*Id*. at PageID.1627-1629). On June 7, Plaintiff saw Dr. Elnaggar for a wart on his thumb and refills. (*Id*. at PageID.1764). On June 15, he met with Karwowski for therapeutic case management and they addressed Plaintiff's frustrations with DHS. (*Id*. at PageID.1624-1626). On June 16, Plaintiff met with Dr. Chapman, who noted that Plaintiff "continued slurring his words with the Klonopin" and wanted to switch back to Ativan, that he experienced anxiety every 2-3 days, and that his bands had shows coming up. (*Id*. at PageID.1620-1623). On June 29, Plaintiff attended a psychotherapy session with Karwowski, in which they discussed his anxiety and sleepwalking episodes. (*Id*. at PageID.1617-1619).

On July 5, Plaintiff followed up with Dr. Elnaggar, who noted Plaintiff was "doing well." (*Id*. at PageID.1761). On July 14, the pair met again to discuss that Plaintiff's change in medicine was working, Plaintiff's triggers, and Plaintiff's upcoming European travel plans for November. (*Id*. at PageID.1614-1616). The same day, he visited Dr. Elnaggar with complaints of abdominal pain; he pulled a muscle and had pain in his left side. (*Id*. at PageID.1758). On July 19, Plaintiff met with Dr. Chapman, who noted that Plaintiff

31

continued to have anxiety symptoms, that he felt better with the medication switch (but that Klonopin was too strong and Ativan was not strong enough), and that he had been sleeping 8 hours a night "for several months now." (*Id*. at PageID.1609-1613). On July 27, Plaintiff saw Dr. Elnaggar with a complaint of back pain and requested a referral to psychical therapy. (*Id*. at PageID.1755). During his psychotherapy session with Karwowski on July 28, Plaintiff noted switching to a different and more effective anxiety medication, that he kept "active and busy," and that he continued to play with his bands. (*Id*. at PageID.1606-1608).

During their psychotherapy session on August 17, Plaintiff and Karwowski met to terminate their sessions and Plaintiff was assigned a new therapist. (*Id*. at PageID.1603-1605). On August 18, Plaintiff met with Dr. Chapman, who observed that Plaintiff's anxiety was controlled by the Librium, that Plaintiff's mood was good, that he had not been having hallucinations, and that he had five hours left of community service for his loitering offense. (*Id*. at PageID.1599-1602).

On September 1, Plaintiff reported to Dr. Elnaggar with complaints of back pain. (*Id*. at PageID.1752). On September 16, Plaintiff met with Chapman again, who observed that Plaintiff felt Seroquel was not helping him sleep as much as it did in the beginning and that Plaintiff was more depressed than before but was much more goal-oriented than he was in the initial evaluation. (*Id*. at 1593-1598). On September 17, Plaintiff reported being "sick" to Dr. Mohey and had sinus pressure and bloody mucous in his nose. (*Id*. at PageID.1750). On September 29, Plaintiff saw Elnaggar with complaints of sinus drainage and lower back pain. (*Id*. at PageID.1746). On October 13, Plaintiff met with Dr. Chapman

who noted that he was "doing well with current medication," "playing with the two bands," had finished his community service and that his sleep was normal. (*Id*. at PageID.1588-1592). On October 21, Plaintiff followed up with Elnaggar with complaints of a cold sore. (*Id*. at PageID.1742). He had an MRI on his back on October 22. (*Id*. at PageID.1741).

On November 10, Plaintiff met with Carol McHenry, Karwowski's replacement, for treatment planning, at which Plaintiff's stated that his mood had stabilized for the most part (*Id*. at PageID.1574-1587). He further noted he had been having hallucinations and that the only way he thought he could gain independence was through SSI benefits. (*Id*. at PageID.1576-1577). He met with McHenry again that day for psychotherapy; Plaintiff told McHenry he heard voices telling him to kill people, that his medications help but do not stop the hallucinations, that he did not have a job "because he can't even drive in his condition," and that he played in a band for fun. (*Id*. at PageID.1572-1573). Also on November 10, Plaintiff met with Dr. Chapman and told him that he was not doing as well with the Librium and wanted to go back to Klonopin, that he continued playing in two bands, and that his sleep was "good." (*Id*. at PageID.1568). On November 14, Plaintiff followed up with Dr. Elnaggar and complained of pain in hands after getting in a fight. (*Id*. at PageID.1738).

On December 1, Plaintiff again met with Carol McHenry for treatment planning, in which the goals were Plaintiff managing hallucinations, managing anxiety, having a better relationship with his step-father, and "to get disability." (*Id*. at PageID.1556-1567). On December 8, Plaintiff met with Dr. Chapman and noted it took a few days to adjust back to Klonopin, that he was "doing well now and denies any problems or complains," and that

33

he was "preparing to tour overseas with his band this spring." (*Id*. at PageID.1552-1555). On December 20, Plaintiff went in for a check up with Dr. Mohey, who noted all systems were normal, that his International Normalized Ratio (INR) was stable, and that he was taking Norco for his back pain. (*Id*. at PageID.1736).

### vi.   2017 Medical Records

On January 5, 2017, Plaintiff met with Dr. Chapman. (*Id*. at PageID.1547-1551). During this visit Plaintiff stated he was "getting too sedated with the Klonopin and want[ed] to switch back to Librium," but was otherwise "doing well with the current meds," that his sleep was good, and that he was going to Europe in March. (*Id*. at PageID.1549). The same day, Plaintiff met with Carol McHenry for psychotherapy, where Plaintiff discussed his relationship with his son and their quality time, that his current medications made him lethargic, and his anxiety. (*Id*. at PageID.1545-1546). On January 19, Plaintiff saw Dr. Elnaggar with complaints of cough productive of green sputum, back pain, and needing INR checked. (*Id*. at PageID.1732). Plaintiff went to the hospital on January 20 for pneumonia and was subsequently diagnosed with "high blood pressure, abnormal blood clotting test, collection of fluid in sac covering heart, head injury, respiratory insufficiency." (*Id*. at PageID.1485). McHenry and Plaintiff met again for psychotherapy on January 24; Plaintiff discussed his "health crisis" of pneumonia, that he was trying to quit smoking, his upcoming trip to Europe, and the medication's effect on his hallucinations. (*Id*. at PageID.1543-1544). On January 26, Plaintiff followed up with Dr. Elnaggar to checkup on his pneumonia and antibiotics; Plaintiff was reportedly "[d]oing much better." (*Id*. at PageID.1729).

On February 2, Plaintiff met with Dr. Chapman and said he was doing well on his current meds, played in two bands, "was in the hospital 4 days recently after falling out of bed and bumping his head," was treated for pneumonia with antibiotics and steroids, and was "doing well with the new therapist." (*Id*. at PageID.1539-1542). On February 9, Plaintiff met with McHenry for psychotherapy; he discussed his relationships with his family and friends, his financial crisis, and that he planned to borrow some money to go to Europe. (*Id*. at PageID.1537-1538). McHenry noted Plaintiff was in a pleasant mood, that his "affect was flat," and that he was "very verbal and insightful." (*Id*. at PageID.1537). On February 17, Plaintiff followed up with Dr. Elnaggar and complained of back pain. (*Id*. at PageID.1725).

On March 2, Plaintiff met with Dr. Chapman and noted his anxiety was "much better with the Librium." (*Id*. at PageID.1533-1536). He met with McHenry on this day as well and discussed stresses he felt regarding his upcoming trip and his own upcoming surgery; Plaintiff noted he was taking his medications and that his hallucinations had "gotten better." (*Id*. at PageID.1531-1532). On March 3, He saw Dr. Elnaggar for a follow up and the review of systems indicated that Plaintiff denied anxiety, depression, any musculoskeletal symptoms, or altered mental status; his mood was "normal," and his affect was "appropriate." (*Id*. at PageID.1722-1724). On March 30, Plaintiff met with McHenry for psychotherapy and talked about his trip to Europe, his relationship with his son, his mood, and his hallucinations; Plaintiff "appeared happy." (*Id*. at PageID.1529). The same day, Plaintiff met with Dr. Chapman and stated that he had just finished his European tour where he "did 18 shows in 20 days," that he "suffered a minor stab wound during the tour

35

from someone he thinks was trying to rob him," that he was "doing about the same mentally," that his anxiety was worse, and that his nightmares and hallucinations were minimal. (*Id*. at PageID.1524-1528). On March 30, Plaintiff also followed up with Dr. Elnaggar with a complaint of back pain. (*Id*. at PageID.1718).

On April 6, Plaintiff saw Dr. Elnaggar with complaints of a wart; he had stopped Pravastatin due to double vision. (*Id*. at PageID.1715). The pair followed up on April 13 to address Plaintiff's herpes outbreak. (*Id*. at PageID.1712). Plaintiff met with McHenry for psychotherapy on April 27 and talked about "how good he feels" and noted that his medication kept him from having hallucinations, that his anxiety levels were down, and that he stopped getting panic attacks. (*Id*. at PageID.1522-1523). During his visit to Dr. Chapman the same day, Plaintiff stated he had developed a tolerance to Librium and wanted to switch back to Klonopin and that he was grieving over the death of a former band member. (*Id*. at PageID.1518-1521). On April 28, Plaintiff followed up with Dr. Elnaggar with a complaint of back pain. (*Id*. at PageID.1708).

On May 18, Plaintiff met with McHenry for psychotherapy and discussed his son, his pain over his former girlfriend breaking up with him, his decrease in anxiety and hallucinations, and his plans to play in a benefit concert. (*Id*. at PageID.1516-1517). On May 25, Plaintiff met with Dr. Chapman and stated his anxiety was "under control with Klonopin," denied hearing any voices for two months but had heard strange sounds and continued playing in two bands. (*Id*. at PageID.1511-1515). The same day, Plaintiff followed up with Dr. Elnaggar and noted back pain. (*Id*. at PageID.1704). On May 30, Plaintiff visited McHenry for psychotherapy and discussed his anger and physical

altercations, noted he was "feeling pretty good due to his meds," and was having fewer hallucinations; McHenry noted that Plaintiff "continues to present with an appropriate affect and pleasant mood." (*Id*. at PageID.1508-1509).

On June 8, 2017, Plaintiff met with Dr. Bray for a consultative mental status examination. (*Id*. at PageID.1494-1502). Plaintiff complained of problems with chest pain, focusing, shortness of breath, hallucinations, panic attacks, and mood swings. (*Id*. at PageID.1494). Dr. Bray diagnosed Plaintiff with bipolar disorder with psychotic features and generalized anxiety with panic attacks. (*Id*.). Dr. Bray noted that although Plaintiff did not have age-appropriate autonomy, most of his activities were done independently. (*Id*. at PageID.1496). Finally, Dr. Bray noted that Plaintiff's "mental ability to relate to others, including fellow workers and supervisors, [was] moderately impaired;" his ability to "understand, remember, and carry out tasks appears to be mildly to moderately impaired"; Plaintiff "was able to perform simple repetitive tasks"; it was likely that Plaintiff "could handle more complex tasks"; Plaintiff's difficulty in "performing multiple step tasks is likely to be moderate." (*Id*. at PageID.1498). On June 20, Plaintiff met with Dr. Chapman; the pair discussed Plaintiff's elevated blood pressure and the fact that Plaintiff had been taking Lisinopril for six years, that Plaintiff's mood and anxiety were good, that he was sleeping well, continued playing in a band, and was going to travel to North Dakota for the wedding of his son's friend. (*Id*. at PageID.1700-1703).

On July 6, Plaintiff met with McHenry and discussed his relationship with his son and potentially getting a marijuana card for his sciatica pain; McHenry noted Plaintiff was "in a pleasant mood, showing full range of emotions," and was insightful and verbal. (*Id*.

at PageID.1698-1699). At their July 20 session, Plaintiff discussed his relationship with his son, his childhood, his relationship with his mother, his father's death; he reported hallucinations that were not threatening in nature. (*Id*. at PageID.1695-1697). The same day, Plaintiff met with Dr. Chapman and stated he continued playing in his band, had recently returned from North Dakota, expressed stress because of his son's girlfriend, and had some anxiety. (*Id*. at PageID.1690-1694).

### 2.    Function Form

On October 6, 2014, Plaintiff completed a function form as part of his application. (*Id.* at PageID.485-493). In it, he claimed disability attributable to psychotic thoughts, anxiety, panic attacks, and schizotypal personality disorder. (*Id.* at PageID.485). During a typical day, he played music, watched television, spent time with his son, and spent time with his dog. (*Id.* at PageID.486). He did not take care of any family members but did care for his dog by feeding him, letting him outside, and playing fetch with him with the help of his mother. (*Id*.). Plaintiff stated that he has always had these conditions. (*Id*.). His conditions affected his sleep; he stayed awake until 5 or 6 am. (*Id*.). Plaintiff indicated on the function report that his conditions did not interfere with his personal care. (*Id*.).

Plaintiff needed no special reminders to take care of his personal needs or grooming, nor did he need help or reminders to take his medication. (*Id*. at PageID.487). Plaintiff indicated that he orders fast food, buys pre-prepared food, or has leftovers for meals daily for about 15 to 20 minutes a day. (*Id*.). Regarding housework, Plaintiff helped with dishes and took care of the pet for between 15 and 30 minutes "once or twice a week" and needed reminders to do so. (*Id*.). Plaintiff indicated that he otherwise does not do house or yard

work because of seasonal and dust allergies. (*Id*.). Plaintiff went outside about between 15 and 20 minutes a day with his pet. (*Id*.). Plaintiff drove himself to get around. (*Id*.). He shopped for food in stores for about 30 minutes to an hour. (*Id*.). Plaintiff was able to count change but unable to pay bills, handle a savings account, or use a checkbook and needed his mother to help with these tasks. (*Id*.). He indicated that his ability to handle money had not changed since his conditions began. (*Id*. at PageID.489).

His hobbies included playing guitar and drawing, both of which he claimed to do daily and "quite well." (*Id*.). Plaintiff spent time with others playing music or watching television two to three times a week. (*Id*.). On a regular basis, he went to the grocery store and therapy. (*Id*.). Plaintiff needed to be reminded to go places, went places several times a month, took little part when he did, and needed someone to accompany him when he did. (*Id*.). He had anxiety interacting with his stepfather and friends. (*Id*. at PageID.490).

Plaintiff's impairments affected his ability to lift, squat, bend, stand, reach, walk, kneel, talk, hear, climb stairs, see, complete tasks, concentrate, understand, follow instructions, get along with other, and use his hands, as well as his memory. (*Id*.). He noted that he could lift 20 pounds but that his leg and back tired easily, and that he needed glasses. (*Id*.). He could walk one city block but needed to rest for about 15 or 20 minutes before he could resume walking. (*Id*.). Plaintiff could pay attention for five to ten minutes and could not finish what he had started. (*Id*.). He noted that he followed written and spoken instructions "poorly." (*Id*.). He also noted that he got along with authority figures "poorly," that he handled stress "poorly," and that he handled changes in routine "poorly." (*Id*. at PageID.491). He had never been fired from a job because of problems getting along with

other people. (*Id.*). He had noticed that he panicked easily. (*Id.*). He wore glasses for driving and seeing distances, which he had been prescribed by a doctor in September 2014. (*Id.*). Plaintiff had been prescribed medicines for his conditions but noted that none of them caused side effects. (*Id.* at PageID.492).

### 3. Administrative Hearings

#### a. Administrative Hearing on April 5, 2016

Plaintiff testified at his first administrative hearing on April 5, 2016. (R. 11 at PageID.78-117). At the hearing, Plaintiff clarified that the onset date of his impairments was June 3, 2013. (*Id.* at PageID.86). Plaintiff lived at his parents' house (mother and stepfather) but saw his son every day, and that he and his son had "an excellent relationship." (*Id.*). Plaintiff had no source of income on his own. (*Id.* at PageID.87). He testified that although he had a driver's license, he had not driven for three years prior to the hearing due to "hallucination of things jumping." (*Id.*). His mother had driven him to the hearing. (*Id.*). He had finished high school. (*Id.*). He had not worked since June 2013, and the last job he had was with Ford Motor Company as a vehicle assembler. (*Id.*).

Plaintiff testified that the impairments preventing him from working were anxiety, panic attacks, and visual and auditory hallucinations. (*Id.* at PageID.88). He testified that he medication he took for his hallucinations "helped dramatically," and that prior to taking the medication he had "called the police on people that weren't even in [his] house" and "punch[ed] holes in the wall and bang[ed] [his] head against the walls"—all of which the medication helped him stop doing. (*Id.* at PageID.89). He had not noticed any negative side effects from the medication. (*Id.*). He had not been hospitalized for psychiatric conditions

40

with the exception of a hospital visit for chest pains related to a panic attack in August 2015. (*Id*.). Plaintiff testified that he had gone to Community Care Services to see Dr. Chapman once a month, along with a therapist, Brad Karwowski. (*Id*. at PageID.90). His mother also took him to these appointments. (*Id*.).

Regarding physical impairments, Plaintiff testified that he had severe back pain and leg pain. (*Id*.). He noted that he had MRIs and x-rays in the past to assess these ailments. (*Id*.). He had been taking Norcos, Hydrocodone, and Acetaminophen for pain. (*Id*.). On a scale of one to ten, when Plaintiff was taking the medication, his pain was at a seven. (*Id*. at PageID.92). Because he was on blood thinners, he could not take Motrin, Aspirin, or Aleve but was limited to Acetaminophen. (*Id*.). He testified that he could usually sit in one place for about 10 to 15 minutes without having to "get up and . . . bend around." (*Id*.). He would walk to the corner store, which he noted was about as far as he could go distance-wise. (*Id*.). He explained that he could stand for "maybe 10 or 15 minutes." (*Id*.). He could lift "probably 15-20 pounds at most." (*Id*. at PageID.93). He testified that he had problems using his hands because he had broken all his fingers and his right wrist, leading to tendinitis. (*Id*.). He noted, however, that in spite of these issues with his hands, he still had been playing guitar for 30 years and knew "a lot of little tricks" to help, although the "older [he got], the more difficult it [became] for [him]." (*Id*.).

Plaintiff further testified that on a typical day, he woke up late, watched television, and played guitar. (*Id*.). He could not read because he would "[get] lost after reading one page." (*Id*.). He noted that in order to remedy this, "they wanted to put [him] on Adderall but it's not good for [his] heart." (*Id*.). He also played with his dog outside, spent time with

his son, and listened to music. (*Id*.). He noted that he spent a lot of time in bed depressed about being "a burden to [his] family without having any income." (*Id*.).

He played a six-string Italia electric guitar every day. (*Id*. at PageID.94). Plaintiff testified that he usually could not play more than half an hour each day. (*Id*.). He noted that he would "start playing the first maybe 5-10 minutes if there's a lot of pain but then it'll go away and [he] can . . . work within . . . certain exercises." (*Id*.). He testified that he was in a punk rock band with his friends and his son and that they got together about once a week. (*Id*. at PageID.95). He did not get paid for his role in the band; the lead singer held any money that the band did earn during a performance to budget for hotel and food costs. (*Id*.). They performed engagements "every couple of months." (*Id*.). He testified that he needed help carrying equipment and bags, as he had previously torn a groin muscle causing a "bad hernia." (*Id*. at PageID.96, 103). He traveled to Europe with the band for two and a half weeks, which he noted "was very hard." (*Id*. at PageID.96-97). The band's travel expenses were largely sponsored by an investor and performed "maybe ten shows." (*Id*. at PageID.97). From the date of the hearing it had been "over eight years" since he had gone to Europe with his band. (*Id*. at PageID.98).

Plaintiff testified that he rarely cooked because his vegetarian diet did not require it of him. (*Id*.). Moreover, because he was vegetarian, he ate most of his meals without his family. (*Id*.). His mother helped him with laundry and yardwork. (*Id*. at PageID.99). He had seasonal allergies, which he said prevented him from doing lawn care. (*Id*.). He could not shovel snow because of his back pain. (*Id*.). Because of Plaintiff's and his mother's physical ailments, they spent little time grocery shopping and would "grab enough for a

few meals and get out of there." (*Id.*).

Plaintiff was a member of church community at Blessed Hope in Lincoln Park. (*Id.*). As a member of this community, Plaintiff volunteered by serving meals to the homeless. (*Id.*). Plaintiff testified that he had a computer at home but was "not computer literate." (*Id.* at PageID.100). He was unsure how much his dog weighed but testified to his ability to lift her. (*Id.*).

The ALJ then asked Plaintiff about a physical altercation Plaintiff had been involved in. (*Id.* at PageID.101). He explained that he had "been in many fights sticking up for people" and that it "seems to happen any time [he went] anywhere so [he] tr[ied] [to] not really get out too much." (*Id.*). He also testified that he had violent thoughts daily. (*Id.* at PageID.104). He noted that he had a problem with police authority and general violent thoughts regularly, but that medication had "really made a difference" in how often and severe the thoughts were. (*Id.*). He also had suicidal thoughts "constantly." (*Id.*). He explained further that these thoughts went through his head daily but that he did not have a "thought out procedure that [he] would take to do such." (*Id.* at PageID.105). He noted that he had panic attacks about once or twice a week but that the medication "helped them a little bit." (*Id.*). When he had anxiety attacks, he had bad chest pains and would contact several family members to make sure they were okay. (*Id.*).

Regarding his previous employment with Ford, Plaintiff testified that he stopped working because he had a hernia and "limitations on the different jobs that [he] could do," and that as his health deteriorated he was "wrongfully fired on medical." (*Id.* at PageID.102). Upon termination from his job at Ford, Plaintiff received unemployment

benefits from the state. (*Id.*).

Plaintiff also testified that although he took Seroquel and Lorazepam as sleep aids, it still took "a long time to fall asleep." (*Id.* at PageID.106). He noted back pain when laying down and that he experienced a "frozen feeling" that kept him from being able to move or get up. (*Id.*). When asked if he was capable of structuring his day or sticking to a routine, Plaintiff responded that he was not capable of doing so and that he had never tried to do so. (*Id.*). When the ALJ further inquired about whether he would be able to follow a structure someone else made for him, he said he could "probably not," because of "different moods [he goes] through." (*Id.* at PageID.107).

Plaintiff then testified that he went to physical therapy for his back. (*Id.*). During his physical therapy, Plaintiff was put on an exercise bike, which he could ride for no longer than 15 minutes. (*Id.*). He noted that the stretches he did in physical therapy were not "really too bad but [didn't] really help." (*Id.* at PageID.108).

He further testified that he had issues with blood clotting and that the pain it created in his legs affected his ability to function. (*Id.*). Plaintiff took blood thinners to alleviate this and monitored the levels every seven to ten days and noted that his levels varied greatly. (*Id.*). At the time of this hearing, he was on probation lasting six months for riding in the car with someone who had marijuana with him. (*Id.* at PageID.109-111).

### b. Administrative Hearing on September 28, 2017

The remand hearing took place on September 28, 2017 because "there was evidence that came in maybe after the hearing." (*Id.* at PageID.121). Exhibits B1-A through B30-F

were admitted to evidence and made part of the record. (*Id*. at PageID.126). Plaintiff argued that "the distinguishing factor to change this case from the last was the diagnosis of a psychotic disorder which was done on June 3, 2013 and that's at 14-F, page 212 and 213" and that Plaintiff's hallucinations had not begun until after the previous hearing. (*Id*. at PageID.127).

### i. Plaintiff's Testimony

Plaintiff testified that the last time he drove was four to five years prior to this hearing. (*Id*. at PageID.130). His therapist told him he should not drive, but this information was never filed with the state. (*Id*.).

He testified that, while at Ford Motor Company, he worked on an assembly line for vehicle assembly. (*Id*. at PageID.132). He testified that, around 2012-2013, after his work at Ford Motor Company, he worked "briefly at a tattoo shop as a body piercer," from which he was "fired for incompetence." (*Id*. at PageID.131). During his time as a body piercer, Plaintiff earned $17 per piercing and that he did "maybe one or two every two/three days." (*Id*. at PageID.132). He worked there for about five months. (*Id*.).

He also testified that he suffered from "several psychological problems as far as panic and anxiety," that he had difficulty focusing, and that he became stressed easily. (*Id*. at PageID.133). He noted that he had to "carry nitrous with [him] because [he got] chest pains and [he had] to put them under [his] tongue." (*Id*.). He had a heart attack when he was 38. (*Id*.). Plaintiff testified that he took several medications, including Benadryl, Xanax, lisinopril, Neurontin, Prilosec, cholesterol medication, diazepam, Effexor, Klonopin, Seroquel, Norco, acetaminophen, and hydrocodone. (*Id*. at PageID.133-35). He

45

noted that these medications helped him "cope" but did not help him "be more productive." (*Id*. at PageID.135). Regarding side effects, Plaintiff testified that he would become "really sick" when he failed to take his medications, especially Neurontin. (*Id*.). Regarding side effects from his other medications, he noted withdrawal symptoms, including headaches, nausea, and eye strains. (*Id*. at PageID.136). He said that his pain when taking medication was a "7 or 8" on a scale of 10 and that "medication barely help[ed]." (*Id*.). He was put on a muscle relaxant to help with back pain. (*Id*.). Plaintiff testified that the last time he had been in the emergency room was for pneumonia. (*Id*. at PageID.137). He did not use a cane or need assistance walking. (*Id*.). He smoked "about a pack-and-a-half every two/three days." (*Id*.). He stated that he did not have any limitations on how long he could sit before having to get up and change positions and noted that he could probably sit for at least two hours before having to get up and move around. (*Id*. at PageID.138). Plaintiff testified further that he could stand for about 15-20 minutes on his own. (*Id*. at PageID.139). He could walk; he walked his dog about three or four blocks regularly. (*Id*.). He could lift about 25 pounds. (*Id*.). He noted that he "sometimes" had problems using his hands because of tendonitis and carpal tunnel but had never had surgery for either. (*Id*.).

On a typical day, Plaintiff laid in bed a lot and watched TV. (*Id*. at PageID.140). He spent time with his neighbor and dog most days. (*Id*.). He rarely did chores; he cooked some of his own meals but, being a vegetarian, the meals he cooked were "pretty simple." (*Id*.). He shopped at the grocery store with his mother. (*Id*. at PageID.140-41). He attended church with another family in his neighborhood. (*Id*.). He noted that he practiced with his band at home. (*Id*. at PageID.142).

46

He again noted that he had daily visual and audio hallucinations but ignored them. (*Id*. at PageID.151-52). Regarding these hallucinations, he explained that he would see something through the corner of his eye, and that auditorily, he would think he heard his parents arguing or someone banging outside the door. (*Id*. at PageID.152). These hallucinations created problems for him when he traveled with his band in Europe; for example, in the van, he thought he saw people jumping out of trees and signs moving. (*Id*.). Plaintiff also noted that he had been having panic attacks "almost daily" since about 2005 or 2006. (*Id*. at PageID.153). He testified that during these panic attacks, his chest would feel tight, his arms hurt, and his "jaw will start feeling real tickly and then it's just like this squeezing feeling and then [he would get] super shaky." (*Id*.). When these happened in public, he noted, people would "run up and grab [him]." (*Id*.). These panic attacks lasted between five and ten minutes. (*Id*.). He was not aware of any triggers for these panic attacks. (*Id*. at PageID.154). He testified that he left his house "maybe once or twice a week" and that he did not talk to people every day. (*Id*.).

### ii. Vocational Expert's Testimony

Scott Silver, the Vocational Expert (VE), testified next. (*Id*.). The ALJ presented the VE with the following hypothetical:

> Assume a person with the same age, education and work experience as the claimant. This person is limited to light exertion work, except that they cannot climb ladders, ropes, or scaffolding. They can occasionally balance, stoop and kneel and crouch and crawl and climb ramps and stairs. They can frequently finger and I guess something of—well, handling and fingering since I'm putting fingering. They can frequently handle and finger with the upper extremities and the can perform unskilled work which is limited to simple, repetitive, self-paced work. They cannot work in a team.

(*Id*. at PageID.156-57). The ALJ then clarified that the hypothetical included "only minimal changes in the work setting and they can have occasional contact with co-workers and the supervisors and no contact with the general public." (*Id*. at PageID.157). The VE responded that "the [Dictionary of Occupational Titles] doesn't discuss self-paced work, so a portion of [his] testimony is based on [his] expertise and observations in the labor market. The past work is precluded." (*Id*.).

The ALJ presented a second hypothetical, noting that this time, if the individual was limited in the ability of the unskilled portion of the work in addition to the previous elements of the first hypothetical, and "they're limited to simple/routine tasks with no more than simple/short instructions and simple/work-related decisions with few workplace changes." (*Id*. at PageID.157-58). The VE responded that an individual fitting this description could fill the following roles: a collator, of which there are 464,000 jobs nationally; an inspector/hang packager, of which there are 667,000 jobs nationally; and laundry worker, of which there are 30,000 jobs nationally. (*Id*. at PageID.158).

The ALJ then inquired about the sedentary level with the same limitations from both hypotheticals. (*Id*. at PageID.159). The VE responded that an individual with this expanded set of limitations could perform the following work: address, of which there are 104,000 jobs nationally; and stuffer, of which there are 71,000 jobs nationally. (*Id*.).

Finally, the ALJ asked the VE the following:

if this person, because of their symptoms, and it seems like more because maybe their mental symptoms, with their focus and their concentration is not consistent or if they need unscheduled work breaks throughout the day and either one of those or both will cause them to be off task let's say 20 percent of the time, would there be jobs that this person could do?

48

(*Id.* at PageID.160). The VE responded that the DOT "is silent on attention to task and breaks," but that per his "experience and observations of the labor market, all work would be precluded and no jobs." (*Id.*).

### F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations[1] carve the evidence into "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513 (2016). "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a) (2016). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d) (2016). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When "acceptable medical sources" issue such opinions, the regulations deem the

---

[1] Various amendments to the regulations were made after the claim was filed. *See, e.g.*, *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844-01 (January 18, 2017) (effective March 27, 2017). The governing regulations here, however, expressly apply to claims filed before March 27, 2017, like Plaintiff's here. *See* 20 C.F.R. § 404.1527.

statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Because Plaintiff filed his claim before March 27, 2017, he is entitled to the benefit of the treating-source rule. Under that rule, certain opinions from his treating physicians can receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(c)(2). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d). Thus, the ALJ "will not give any special significance to the source of an

opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits must give specific reasons, supported by record evidence, for the weight granted to a treating source's opinion. *Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must also analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996).[2] Credibility determinations regarding a claimant's subjective complaints rest with

---

[2] Although the Commissioner has rescinded SSR 96-7p and eliminated the term "credibility" from Administration policy, SSR 16-3p, 2016 WL 1119029, at *1 (Mar. 16, 2016), the underlying regulation has remained materially unchanged, *see* 20. C.F.R. § 404.1529(c), and I agree with the courts in this District that have continued to apply SSR 96-7p to cases arising prior to its rescission. *See, e.g., Cooper v. Comm'r of Soc. Sec.*, No. 16-cv-13477, 2017 WL 3923984, at *3 (E.D. Mich. August 21, 2017), *Rep. & Rec. adopted by* 2017 WL 3891971 (E.D. Mich. Sept. 9, 2017); *Tuttle v. Comm'r of Soc. Sec.*, No. 16-11144, 2017 WL 2928021, at *6 n. 3 (E.D. Mich. June 9, 2017), *Rep. & Rec. adopted by* 2017 WL 2905125 (E.D. Mich. July 7, 2017).

the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987).

Generally, an ALJ's credibility assessment can be disturbed only for a "compelling

reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v.

Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating

subjective symptoms, including pain. 20 C.F.R. § 404.1529(a) (2016); SSR 96-7p, 1996

WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by

confirming that objective medical evidence of the underlying condition exists. The ALJ

then determines whether that condition could reasonably be expected to produce the

alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20

C.F.R. § 404.1529 (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v.

Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the

extent of the work-related limitations by determining the intensity, persistence, and limiting

effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of

Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*,

749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's

description of his or her physical or mental impairments will "not alone establish that [he

or she is] disabled." 20 C.F.R. § 404.1529(a). Nonetheless, the ALJ may not disregard the

claimant's subjective complaints about the severity and persistence of the pain simply

because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1

(July 2, 1996). Instead, the absence of objective, confirming evidence forces the ALJ to

consider various factors. 20 C.F.R. § 404.1529(c)(3) (2016); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994).

### G.   Analysis

At dispute in this case is whether the ALJ properly relied on consultative opinions in her determination in light of the fact that the ALJ acknowledged there had been a change in Plaintiff's condition. Plaintiff argues that the ALJ erred in giving the consultative examiners' evaluations great weight because those determinations were made in 2014 and the ALJ had specifically found that there had been a significant change in Plaintiff's condition since 2016. (R. 15 at PageID.1821). Defendant argues that when the ALJ issued her prior decision, she was not bound by the 2013 decision because there was a change in the Plaintiff's condition since that decision. (R. 19 at PageID.1842). Prominent in Plaintiff's argument is the claim that the ALJ did not give sufficient weight to certain evidence, which will be discussed and analyzed below.

### i.   Parties' Arguments

Plaintiff argues that the ALJ's analysis of Plaintiff's limitations, specifically, his mental impairments, was "internally inconsistent and unsupported by substantial evidence." (R. 15 at PageID.1819). Plaintiff makes five arguments to this point. First, Plaintiff argues that the ALJ's decision to give great weight to State Agency psychological consultant Jerry Csokasy was inappropriate because he was a non-examining source who did not review the whole record. (*Id.* at PageID.1820-1821). Second, Plaintiff argues that the ALJ's decision to discredit the opinion of Plaintiff's therapist, Brad Karwowski, was improper and required further analysis. (*Id.* at PageID.1821-1822). Third, Plaintiff argues

that the ALJ's decision to accord Dr. Chapman's opinion limited weight and contests the ALJ's application of the rule requiring her to measure Plaintiff's disability by his ability to do sustained work. (*Id.* at PageID.1823-1825). Fourth, Plaintiff argues that the ALJ improperly discounted Carol McHenry's opinion by referring to a single treatment note in the record from 2016. (*Id.* at PageID.1825-1826). Fifth, Plaintiff argues that the ALJ improperly gave great weigh to the opinion of consultative psychological examiner Dr. Bray. (*Id.* at PageID.1826-1827).

Defendant counters that the ALJ properly considered the fact that Dr. Csokasy had not reviewed the entire case record and thus met her requirement under the relevant caselaw. (R. 19 at PageID.1842-1845). Next, Defendant argues that the ALJ properly discredited Karwowski's opinion because he was not an acceptable medical source and his opinions were conclusory. (*Id.* at PageID.1847-1853). Defendant then argues that ALJ properly considered the opinion of Dr. Chapman and gave it the appropriate weight due to its inconsistencies with Plaintiff's actions and testimony. (*Id.* at PageID.1854-1860). Fourth, Defendant argues that the ALJ's decision to discount McHenry's opinion was proper because McHenry failed to identify specific time periods when Plaintiff's impairments were *per se* disabling and its inconsistency with other evidence. (*Id.* at PageID.1860-1864). Finally, Defendant argues that the ALJ properly evaluated Dr. Bray's opinion because it was thorough, objective, and consistent with most of the other evidence. (*Id.* at PageID.1864-1868).

These arguments will be individually discussed and analyzed below.

  **ii.**  **State Agency Psychological Consultant Jerry Csokasy**

In November 2014, Dr. Csokasy opined that Plaintiff could perform routine, simple tasks on a sustained basis with minimal interaction with others. (R.11 at PageID.206-222). Based on this evidence, which the ALJ gave "great weight," and the additional evidence, the ALJ found that Plaintiff was not disabled between May 2013 and January 2018. (*Id*. at PageID.60-66). Plaintiff argues that the weight given by the ALJ to the opinion of Csokasy was inappropriate because the ALJ did so "without noting that he had never reviewed a significant amount of evidence" and failed to review subsequent evidence despite a finding of significant change in Plaintiff's condition since 2016. (R. 15 at PageID.1820).

Plaintiff's legal basis for this argument is *Miller v. Comm'r of Soc. Sec*., in which the Sixth Circuit held that "[w]here the non-examining source did not review a complete case record, 'we require some indication that the ALJ at least considered these facts before giving greater weight to an opinion from the non-examining source.'" 811 F.3d 825, 834 (6th Cir. 2016) (citation omitted). Plaintiff claims that the ALJ failed to consider or acknowledge the fact that there was subsequent relevant evidence and that the ALJ gave the consultative examiner's opinion "greater weight than she accorded to the opinions of every single one of plaintiff's treaters, be they doctors or therapists." (R. 15 at PageID.1821).

Courts in this District have rejected *Miller* arguments similar to Plaintiff's. In *Markland v. Comm'r of Soc. Sec.*, No. 15-11578. 2016 WL 8116885, at *3 (E.D. Mich. Sept. 22, 2016), the Court rejected a similar Miller argument: because the ALJ had "explicitly noted that the record contained further details," the ALJ's consideration was sufficient, and "the ALJ was not required to explicitly address each piece of conflicting

evidence." Here, the ALJ did explicitly note that there was subsequent evidence following Dr. Csokasy's opinion in 2014: "The undersigned also notes that in the latter dated CE narrative report, Dr. Bray commented that the claimant's mental ability to relate to others, including fellow workers and supervisors, was moderately impaired." (R. 11 at PageID.61). Under *Markland*, therefore, the ALJ's mention here is sufficient consideration for the purposes of satisfying *Miller*.

More recently, in *Sloan v. Comm'r of Soc. Sec.*, No. 17-11150, 2019 WL 458163, at *3 (E.D. Mich. Feb. 6, 2019), the court again rejected this line of argument pertaining to *Miller*. The rationale was two-fold: first, the court in *Sloan* noted that the ALJ's summarization of the evidence post-dating the non-examining opinion was sufficient to comply with *Miller*; second, based on a review of the record, the ALJ had imposed greater limitations than recommended by the non-examiner. *Id*. Here, the ALJ summarized the evidence after the date of Dr. Csokasy's opinion, which included over a dozen paragraphs of evidence referenced after this opinion. (R. 11 at PageID.59-60). Additionally, the ALJ limited Plaintiff's ability more than what Csokasy's opinion: while Dr. Csokasy opined that Plaintiff was only moderately limited in his ability to interact with the general public and had no adaptation limitations, the ALJ limited Plaintiff to "no contact with the general public whatsoever" and found that Plaintiff could only adapt to "minimal changes in the work setting and a few work place changes." (*Id*. at PageID.53).

In light of the similarities between the *Miller* argument here and those which the courts rejected in *Markman* and *Sloan*, I am unpersuaded by Plaintiff's *Miller* argument and conclude that the ALJ properly considered subsequent evidence and thus did not err in

assigning weight to Dr. Csokasy's opinion.

### iii.   Therapist Brad Karwowski

Next, Plaintiff argues that the ALJ "discredited the opinion of plaintiff's long-time therapist, Brad Karwowski, because the therapist indicated that plaintiff had concentration problems and trouble with decision making." (R. 15 at PageID.1821). Further, Plaintiff claims that the ALJ "wrote that there was nothing in the treatment records to indicate any significant concentration problems" even though "the record includes evidence of 'clouded thoughts,' difficulty with focus and concentration, and confusion throughout the day." (*Id.*).

The operative word here is "significant": the ALJ did concede in her determination that while Plaintiff had some concentration problems, they were not significant enough to prevent Plaintiff from playing in multiple bands and touring Europe—facts that were "very significant" in the determination. (R. 11 at PageID.232-33). In her determination, the ALJ expressly noted that although

> some of the treatment notes from Community Care Services contain complaints of poor concentration and hallucinations, they are inconsistent with many findings of no "perceptual disturbances evident" and intact with concentration and memory. Several reports in Exhibits B-14F, B-15F, and B-17F state that there has been some progress or that progress had been made.

(R. 11 at PageID.235). In evaluating the weight to give the opinions of Karwowski, the ALJ noted that "Mr. Karwowski is not even an acceptable medical source pursuant to 20 CFR 404.1513 and 416.913. He is a social worker." (*Id.*). Although the fact that Plaintiff sustained a consistent relationship with this trusted therapist should be given some weight in a comprehensive evaluation of Plaintiff's condition, the fact that Mr. Karwowski is not

an acceptable medical source under 20 C.F.R. §§ 404.1513 and 416.913 means the ALJ had discretion to give the opinion less weight. *See Gayhart v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530 (6th Cir. 1997) (noting that "the ALJ has the discretion to determine the appropriate weight to accord a chiropractor's opinion based on all evidence in the record since a chiropractor is not a medical source" and favorably citing caselaw "reading 20 C.F.R. § 404.1513 as 'accord[ing] less weight to chiropractors than to medical doctors'" (*quoting Griego v. Sullivan*, 940 F.2d, 945 (5th Cir. 1991))); *cf.* SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006) (only "acceptable medical sources" can establish the existence of an impairment; a non-acceptable source cannot issue a "medical opinion"); *Engebrecht v. Comm'r of Soc. Sec.*, 572 Fed. App'x. 392, 397-98 (6th Cir. 2014) ( "This court has 'previously held that an ALJ has discretion to determine the proper weight to accord opinions from "other sources."'" (*quoting Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir.2007).

Moreover, Plaintiff relies heavily on Karwowski's statement that Plaintiff is unable to work; the ALJ opined that the "conclusion of disability is reserved to the Commissioner, and the record before the undersigned certainly does not establish that the claimant is disabled." (R. 11 at PageID.235). Accordingly, as a conclusive determination made by someone other than the Commissioner, Karwowski's opinion that Plaintiff is disabled should be given "no weight." *Cosma v. Comm'r Soc. Sec.*, 652 F. App'x 310, 311 (6th Cir. 2016); *see also* 20 C.F.R. §§ 404.1527(d), 416.927(d). Therefore, the ALJ properly evaluated Karwowski's assessment.

### iv.    Psychiatrist Dr. Chapman

58

Plaintiff argues that the ALJ improperly evaluated psychiatrist Dr. Chapman's opinion. (R. 15 at PageID.1823). Dr. Chapman determined that Plaintiff was limited in his ability to remember work-like procedures and locations; understanding, remembering, and carrying out detailed instructions. (R. 11 at PageID.1480-84). Dr. Chapman also opined that Plaintiff had difficulty maintaining concentration for extended periods, performing activities within a set schedule, being punctual, completing a workday without interruption, responding adequately to workplace changes, and making plans independently. (*Id.*). Moreover, Dr. Chapman determined that Plaintiff had moderate-to-marked limitations understanding, remembering, and carrying out simple instructions. (*Id*. at PageID.1482).

In her determination, the ALJ discounted Dr. Chapman's opinions because they were inconsistent with and "unsupported by treating source progress reports." (*Id.* at PageID.235). The ALJ discussed the opinions of Dr. Chapman and found that "the many unremarkable findings in Exhibits B-14F, B-15F, and B-17F do not support his allegation of 'extreme complications' in Exhibit-5F." (*Id.*). The ALJ noted that "most examinations yielded stable findings and 'many' were normal," (*id.*), which Plaintiff takes as an indication that he could not perform sustained work: "a claimant's disability is not judged based on his ability to work sometimes. Instead, disability is measured based upon a claimant's 'ability to do sustained work activities in an ordinary work setting on a regular and continuing basis." (R. 15 at PageID.1824).

In making this argument, Plaintiff implies that *any* hinderance in a claimant's ability to perform sustained work on a continued basis translates to a complete inability engage in sustained work. While Plaintiff correctly notes that the language in SSR 96-8p indicates

that disability is measured by a claimant's ability to work "8 hours a day, for 5 days a week, or an equivalent work schedule," (*Id*. at PageID.1824), the justification he gives for being disabled is that merely "most" of the examinations yielded "stable findings" and that "many" were "normal"—which suggests that the only acceptable criteria for an ALJ deeming an individual not disabled would be if *all* the examinations yielded results that were stable and normal. There is no such requirement in the law, and therefore I am unpersuaded by this portion of Plaintiff's argument.

Additionally, and as the ALJ pointed out, Dr. Chapman's assessment was inconsistent with the 2015 progress report. (R. 11 at PageID.65). During Plaintiff's November 2015 visit to Dr. Chapman, Chapman noted that Plaintiff was still playing in his band and planned to go on tour in Europe, that his medications helped significantly, that his mood was normal and alert, and that Plaintiff had no perceptual disturbances. (R. 11 and PageID.1194-98). In the December 2016 progress report, Dr. Chapman determined that Plaintiff's medication had markedly aided in anxiety and hallucination management, that Plaintiff's depression symptoms had significantly decreased, that Plaintiff felt "much better," and that Plaintiff was in a position in which he felt he only required therapy and case management "when needed." (*Id*. at PageID.1663-1681). Other objective examinations support Dr. Chapman's conclusion; notably, when Plaintiff saw Dr. Mohey on December 20, 2016, Dr. Mohey noted that all of Plaintiff's systems were "normal." (*Id.* at PageID.1736).

While Dr. Chapman's opinion indicates some serious ailments, it is also inconsistent with Plaintiff's activities: Plaintiff played in a band, attended church, spent two weeks

60

performing throughout Europe, shopped, drove, prepared simple meals, spent time with his family and friends, and cared for his dog. (*Id*. at PageID.78- 162). The ALJ explicitly recognized that Dr. Chapman's observationthat Plaintiff "continued to experience anxiety, depression, and difficulty with focus and concentration." (*Id*. at PageID.65). With that said, the ALJ also noted that during this visit, Plaintiff reported that "his depression symptoms had decreased significantly and that he felt much better," and that while he still had confusion, he was still "able to fully function and take care of himself." (*Id*.). Further, the ALJ noted Plaintiff's wide range of activities during the relevant period as pertinent to her decision: "he did multiple shows in 4 different countries including Spain, France, and Germany. The claimant stated that he was drinking on tour and went off his medication briefly," and that Plaintiff had recently "returned from a trip to North Dakota for a wedding of his son's friend." (*Id*. at PageID.66).

I thus am unpersuaded by Plaintiff's characterization of the ALJ's evaluation of Dr. Chapman's opinion.

### v.   Therapist Carol McHenry

Regarding the opinion of therapist McHenry, Plaintiff claims that the ALJ's evaluation was insufficient because she "discounted her opinion as to plaintiff's overall condition by referring to a single treatment note, memorializing plaintiff's mental state on just one date and that date only." (R. 15 at PageID.1825). This is inconsistent with the ALJ's analysis, which also noted other factors; the ALJ noted that McHenry's statement "fails to identify when the claimant's symptoms were serious enough to become disabling" and that McHenry was not an "acceptable medical source." (R. 11 at PageID.66).

Regarding the "single treatment note," the ALJ also discounted McHenry's assessment because it was "directly inconsistent with Dr. Chapman's treatment note of December 14, 2016." (*Id.*). Specifically, McHenry's opinion that Plaintiff was unable to perform and maintain a full-time job was at odds with Dr. Chapman's note that Plaintiff's symptoms had "decreased significantly," that Plaintiff "felt much better," and that Plaintiff was "able to fully function and take care of himself." (*Id.*). To add to the objective inconsistency with Ms. McHenry's opinion, Dr. Mohey noted the same month that all of Plaintiff's systems were "normal." (*Id.* at PageID.1736). Because of this, and because Ms. McHenry was not an acceptable medical source, but Dr. Chapman was, the ALJ assigned less weight to Ms. McHenry's opinion. (*Id.* at PageID.66).  Moreover, the ALJ explained the rationale behind giving more credit to Dr. Chapman's note than Ms. McHenry's opinion in more detail: she noted that Plaintiff had recently traveled to North Dakota for a wedding and had continued to work with his band, play guitar daily, went to Europe and drank on tour with his band, which indicated that Plaintiff was not too disabled to enter the workforce. (*Id.*). Courts have held that a Plaintiff's capability of engaging in "common activities" can be inconsistent with an allegedly severe mental health impairment. *Cf. Cooper v. Comm'r of Soc. Sec.*, 217 F. App'x 450, 452 (6th Cir. 2007) (noting that a plaintiff's performance of activities such as "semiskilled work for a number of years, played guitar, and riding a motorcycle" were inconsistent with the level of "mental retardation" requisite to warrant disability for social security purposes).

Finally, I am unpersuaded by Plaintiff's claim that the ALJ improperly determined that Ms. McHenry did not have a "significant longitudinal history" with Plaintiff. (R. 15 at

PageID.1825). Plaintiff had not begun treatment with Ms. McHenry until over three years after the period of ALJ adjudication. (R. 11 at PageID.69).

### vi.   Consultative Psychological Examiner Dr. Bray

In Dr. Bray's examination of Plaintiff, he determined that Plaintiff had "mild" difficulty understanding, remembering, and carrying out simple instructions; "moderate difficulty" handling complex tasks and interacting with supervisors; "moderate to marked" difficulty responding appropriately to usual work situations and to changes in routine work setting; and "moderate" difficulty making judgments on simple work-related decision and interacting appropriately with the public. (*Id*. at PageID.1494-1502). The ALJ gave "great weight" to Dr. Bray's opinion about Plaintiff's condition. (*Id*. at PageID.61).

Plaintiff argues that the ALJ did not properly evaluate Dr. Bray's opinion. (R. 15 at PageID.1826). In her opinion, however, it is clear the ALJ considered a breadth of Dr. Bray's opinions, going so far as to explicitly concede that Dr. Bray diagnosed Plaintiff with bipolar disorder with psychotic features and generalized anxiety disorder in 2017. (R. 11 at PageID.60). All of the other observations in Dr. Bray's report indicate that in spite of this illness, Plaintiff was able to generally function independently and that his impairments were moderate. (*Id*.). Therefore, I am unconvinced by Plaintiff's final argument that the ALJ improperly considered Dr. Bray's report in her disability determination.

### H.   Conclusion

For these reasons, I conclude that substantial evidence supports the ALJ's decision. Consequently, I recommend **DENYING** Plaintiff's Motion, (R. 15), **GRANTING** the Commissioner's Motion, (R. 15), and **AFFIRMING** the Commissioner's final decision

denying benefits.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without

merit, it may rule without awaiting the response.

Date:  November 8, 2019                    /S PATRICIA T. MORRIS
                                           Patricia T. Morris
                                           United States Magistrate Judge

## CERTIFICATION

I hereby certify that this Report and Recommendation was electronically served on counsel of record and served on U.S. District Judge Thomas Ludington in the traditional manner.

Date:  November 7, 2019              By  s/Sara Krause acting in the absence of
                                     Case Manager, Kristen Castaneda